We think our conclusion herein is supported in principle by the following cases, although, as before stated, the facts in each of the cited cases differ from those involved in the instant case: *United States v. A Chain Cable*, Fed. Cas. 14776, 25 Fed. Cases 391; *Alex. Livingstone v. United States*, T. D. 13779; and *Thornley & Pitt et al. v. United States*, 18 C. C. P. A. (Customs) 265, T. D. 44428. See also 22 Op. Atty. Gen. 360.

For the reasons hereinbefore set out, the judgment of the United States Customs Court is *reversed*, and the cause is *remanded* for further proceedings consistent with the views herein expressed.

▮▮▮▮▮▮

WHITEHALL SHIPPING Co. *v.* UNITED STATES (No. 4346)[1]

United States Court of Customs and Patent Appeals, November 3, 1941

*Jordan & Klingaman* (*J. L. Klingaman,* of counsel) for appellant.
*Paul P. Rao,* Assistant Attorney General (*Charles D. Lawrence,* Special Assistant to the Attorney General, *Richard E. FitzGibbon* and *Richard F. Weeks,* special attorneys, of counsel), for the United States.

[Oral argument October 7, 1941, by Mr. Klingaman and Mr. Weeks]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Second Division.

Merchandise, described on the invoice as "Aluminum Scrap Grindings," was held by the trial court on the record presented to be dutiable as aluminum scrap at 4 cents per pound under paragraph 374 of the Tariff Act of 1930, rather than as aluminum in crude form at 4 cents per pound under the same paragraph as assessed by the collector at the port of New York, or as waste, not specially provided for, at 10 per centum ad valorem under paragraph 1555 of that act as claimed by the importer.

The pertinent part of paragraph 374 and paragraph 1555 read:

PAR. 374. Aluminum, aluminum scrap, and alloys (except those provided for in paragraph 302) in which aluminum is the component material of chief value, in crude form, 4 cents per pound; * * *.

PAR. 1555. Waste, not specially provided for, 10 per centum ad valorem.

It appears from the record that the involved merchandise, which consists of the "sweepings of machine shops and places of that sort," is generally known as "aluminum grindings," although it is sometimes referred to as "aluminum dross" and "aluminum trimmings."

According to appellant's witness Everett G. McDonough, a chemist in charge of the laboratory and technical developments of Inecto, Inc., (importer of the involved merchandise, appellant being the importer's broker), aluminum grindings are sometimes purchased by the importer in the United States "from people who make pots and pans, for example, and castings. The pots and pans, or any blank form, that has to be finished off, to finish it off they have to grind the material down, and this is the material that is ground off. We buy mostly through junk dealers because one manufacturer is able to have only a limited or a small amount, and the junk dealer buys it from several manufacturers and processes it and then sells it to the machine shops for aluminum grindings." The witness further testified as follows:

Q. This [apparently referring to the involved merchandise] is the portion that is obtained in the manufacture of pots and pans or articles which are ground off in order to give them a finished shape that is wanted?—A. That's right.

Q. Would you say that that is the origin of these aluminum grindings generally regardless of where they are made?—A. Yes. I have heard—this is hearsay— that the *grindings we get from England, from London, comes from a company that manufactures castings, aluminum castings,* and *the grindings is the material that they get when they turn down the castings to shape.*

Q. Whatever the origin of the article may be, you understand that this is what is ground off in producing articles in order to give the articles the surface and shape that is desired?—A. That's right.

Q. What do you do with this merchandise?—A. We use the product. We manufacture a small electro-thermostat used for the waving of hair, and these aluminum grindings furnish a reducing agent in that electro-thermostat in connection with the chemical reaction which is setup. In other words, the aluminum acts as an oxidizing agent for the heat that is generated.

Q. You add other metals in your use of these aluminum grindings in the method you just described?—A. Yes, these aluminum grindings are at least 18 or 20 percent of the whole thing.

\*        \*        \*        \*        \*        \*        \*

A.   \* \* \*   *I might point out that the material we get in here has to be cleaned. After all, the sweepings of a floor are quite dirty and nasty. I mean it is greasy, and also there are bigger pieces of metal which we screen out, larger pieces of metal. We also dry it and wash it. We dry off most of the grease. You will notice that material, Exhibit 1, has a lot of grease in it.*

X   Q. *The use of it is merely as aluminum?*—A. *The use is merely as aluminum, to furnish a reducing agent. Its function is as a reducing agent, that is a chemical reducing agent. Other materials which can be used would be zinc and iron, but we find that aluminum is by far the best.*

X   Q. If you had a pig of aluminum and ground it down into powder, it could be used just the same?—A. Oh, yes.

\*        \*        \*        \*        \*        \*        \*

R.   Q. If you were to grind aluminum made from pigs as suggested by government counsel, you would have to add in other metals, such as you find in this imported merchandise?—A. Oh, you would have to adjust your formula. You could not just substitute one for the other. [Italics ours.]

The record also contains two laboratory reports—appellee's Exhibits 2 and 3—made by a Government chemist, who examined samples of the involved merchandise. Exhibit 2 relates to a sample of one of the importations here involved, and contains, among other things, the following: "Required: Identity, per cent metals?  *  *  *  Report: Sample of aluminum scrap grindings containing 85.0% aluminum." Exhibit 3 relates to a sample of the other importation, and contains, among other things, the following: "Required: Identity, per cent metals?  *  *  *  Report: Sample of aluminum scrap grindings containing 66.0% aluminum.   (Chief value.)"

The foregoing is substantially all of the evidence of record.

Apparently aluminum grindings produced in the United States are the refuse or waste resulting from the grinding of pots, pans, and castings, whereas, according to appellant's witness, McDonough, although he stated that his testimony was hearsay, aluminum grindings produced in London, England (where the involved merchandise was produced), are the refuse material resulting from the grinding of aluminum castings.   Whether the aluminum castings from which, during their manufacture, merchandise similar to that here involved is produced in England are composed of aluminum or of an aluminum alloy does not appear from the evidence of record, nor is there any evidence of record as to whether the pots, pans, and castings from which, during their manufacture, aluminum grindings are produced in the United States are composed of aluminum or of an aluminum alloy.

The witness McDonough testified that the involved merchandise consists of "the sweepings of machine shops and places of that sort"; that it is dirty and has a "lot of grease in it"; and that, as imported, it contained larger pieces of metal than the material which was introduced in evidence (appellant's Exhibit 1) as representative of the involved merchandise, and which is granular in form.   Whether or not the larger pieces of metal were aluminum, the witness did not state.

It will be observed from the reports of the Government chemist that he was required to report the identity of the percentage of metals; that he reported that the sample referred to in Exhibit 2 contained 85 per centum aluminum, and that the sample referred to in Exhibit 3 contained 66 per centum aluminum.   Neither of those exhibits contains any statement that the samples analyzed contained any other metallic substance.   So far as appears from this record, the samples submitted to the Government chemist contained aluminum and impurities such as dirt and grease.

It is contended here by counsel for appellant that the terms "Aluminum" and "aluminum scrap" contained in paragraph 374, *supra*, were

intended by the Congress to apply to substances composed wholly or substantially wholly of aluminum; that the presumption attending the collector's classification is that the involved merchandise *is aluminum* in crude form, not aluminum *scrap;* that the burden was upon the Government to establish that the involved merchandise is aluminum scrap; and that it has failed to sustain that burden.

The collector having classified the involved merchandise as *aluminum* in crude form, the burden was upon appellant to overcome the presumption of correctness attending the collector's classification by establishing not only that the collector was wrong, but that appellant's contention was right. In other words, the burden was upon appellant to establish that the involved merchandise is a waste, *not specially provided for,* under paragraph 1555, *supra,* rather than *aluminum in crude form* provided for in paragraph 374.

Assuming, without holding, that counsel for appellant's contention is correct and that the provision for "Aluminum" and "aluminum scrap" in paragraph 374 was intended by the Congress to cover only such material as consists wholly or substantially wholly of aluminum, it must be presumed that in classifying the involved merchandise as aluminum in crude form the collector found that it consisted wholly or substantially wholly of aluminum. Accordingly, proof that the merchandise in question is an aluminum refuse, scrap, or waste, resulting from certain manufacturing operations of aluminum castings, or aluminum pots and pans, is sufficient only to establish that it is *not* aluminum in crude form. It is not sufficient to establish that such merchandise is not a refuse, scrap, or waste composed wholly or substantially wholly of aluminum.

It is clear from the evidence that the merchandise in question is not aluminum in crude form but is, in fact, a refuse, scrap, or waste material. The record, however, fails to overcome the presumption of correctness attending the collector's classification that it is composed wholly or substantially wholly of aluminum. Such conclusion is in harmony with the decisions of this court in the cases of *United States* v. *White Sulphur Springs,* 21 C. C. P. A. (Customs) 203, T. D. 46728; *United States* v. *Bullocks, Inc.,* 24 C. C. P. A. (Customs) 41, T. D. 48330; and *United States* v. *Yick Shew Tong Co.,* 25 C. C. P. A. (Customs) 255, T. D. 49392, relied upon here by counsel for appellant.

In the last-cited case, the collector assessed certain merchandise as drugs, advanced in value or condition, under the provisions of paragraph 34 of the Tariff Act of 1930. The Government contended in this court that the merchandise was properly dutiable either as fruits, dried, or otherwise prepared or preserved, under paragraph 752, or as vegetables, prepared or preserved, under paragraph 775 of that act.

In our decision in that case, the court, relying upon and citing as

authority our decision in the case of *Doap Leun Hong Co.* v. *United States*, 19 C. C. P. A. (Customs) 313, T. D. 45481, said, *inter alia:*

It should be made clear that the burden of sustaining the claims under paragraphs 772 [should be 752] and 775 rests upon the Government. The presumption with which we must begin is that of the correctness of the collector's classification. This presumption so far as it applies to the "advanced" condition of the commodities, in our opinion, has been overcome, *but the presumption that they are drugs still obtains.* [Italics not quoted.]

For the reasons stated, the judgment is *affirmed.*